## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **W.D.D., a minor, by his father and next friend, Alan D., Sr.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **No. 08 C 6817** |
| | ) |
| **MICHAEL J. ASTRUE,** | ) **Judge Sheila Finnegan** |
| **Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM OPINION AND ORDER

The Social Security Administration ("SSA") found Denise Clow ("Denise") disabled from April 1, 2001, to August 31, 2003, based on a severe mental impairment. For that closed period, she was awarded Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act. 42 U.S.C. §§ 416, 423(d), 1381a. Denise appealed, claiming that her disability continued after August 2003. Following Denise's death in January 2005, her minor son, W.D.D., was substituted as the claimant in the case. When the Commissioner of Social Security ("Commissioner") later denied Denise's application for additional benefits, W.D.D. filed this action seeking review of that final decision. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and have now filed competing motions for judgment on the pleadings and for summary judgment. For the reasons set forth here, W.D.D.'s request for remand is granted, and the Commissioner's motion is denied.

## PROCEDURAL HISTORY

Denise applied for DIB and SSI in March 2002, alleging that she became disabled on April 1, 2001, due to degenerative disc disease, osteoporosis, arthritis, depression, anxiety and obesity. (R. 90, 165-67.) The applications were denied initially and on reconsideration. (R. 85-90, 96-99.) Denise requested an administrative hearing, and appeared with counsel on December 29, 2003.

Shortly thereafter, on January 30, 2004, Administrative Law Judge ("ALJ") Alfred Burton found that Denise was disabled during the closed period of April 1, 2001, through August 26, 2003, but that she then had the residual functional capacity ("RFC") to perform her past relevant work as a bookkeeper. (R. 77-83.) The Appeals Council remanded the case on September 3, 2004, instructing the ALJ to obtain additional evidence concerning Denise's multiple impairments; further evaluate Denise's subjective complaints and her mental impairments; give further consideration to Denise's maximum RFC; and, if appropriate, determine whether drug addiction and alcoholism were "contributing factors material to the finding of disability." (R. 130-33.)

On January 8, 2005, Denise died of an accidental drug overdose. (R. 21, 594.) Her minor son, W.D.D., was substituted as the claimant at that time. On December 13, 2005, ALJ Denise McDuffie Martin conducted a second hearing in Denise's case, and heard testimony from two medical experts, a vocational expert ("VE"), and Denise's mother, Ellen Clow. (R. 587-625.) Approximately four months later, on April 28, 2006, ALJ Martin found that Denise was disabled from April 1, 2001, through August 30, 2003, because her severe depression met Listing 12.04 of the Social Security Regulations. (R. 62-70A.) The ALJ also found, however, that Denise medically improved as of August 31, 2003, and had the RFC to perform sedentary work with the following restrictions: no climbing ladders, ropes or scaffolds; occasionally climbing a ramp and 2-3 stairs; no sitting and/or standing for more than ½ to 1 hour at a time; minimal contact with supervisors, co-workers and the public; no exposure to hazards; and performance of only simple, routine, low stress work. (R. 69.) The Appeals Council remanded the case once again on April 9, 2007, for further consideration and evaluation of Denise's maximum RFC, particularly in light of her obesity. The Appeals Council instructed the ALJ to evaluate Ellen's testimony, obtain supplemental evidence from a VE, and consider Denise's drug addiction and/or alcoholism in assessing her disability claim. (R. 42-44.)

2

ALJ Martin presided over the third hearing in this case on November 15, 2007, again hearing testimony from Ellen Clow and a VE. (R. 535-76.) On January 22, 2008, the ALJ affirmed that Denise was disabled from April 1, 2001, to August 31, 2003, but that she then medically improved enough for an RFC of sedentary work with certain restrictions. (R. 21-35.) The ALJ held that Denise's substance use disorder was not a contributing factor material to the determination of disability, and relied on the VE's testimony in concluding that she could perform a significant number of jobs available in the national economy. (R. 29, 33.)

This time, the Appeals Council denied W.D.D.'s request for review, and he now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner.

## FACTUAL BACKGROUND

Denise was born on June 4, 1968, and was 36 years old at the time of her death in January 2005. (R. 165.) She obtained an associate's degree after graduating from high school, and has worked as an administrative assistant, clerk, and bookkeeper. (R. 208, 296, 559.) In 1999, Denise's father committed suicide in front of her. The police officers who arrived on the scene mistakenly concluded that Denise had shot her father, and angrily threw her to the ground. It appears that Denise started having mental problems after that event. (R. 285, 556-57.)

### A. Medical History

#### 1. Mental Health, November 2001 to August 2003

On November 19, 2001, Denise was admitted to Morris Hospital after she attempted to hang herself while in the Morris Township Jail. (R. 265, 267.) An MRI and CT scan of her cervical spine showed no significant abnormalities notwithstanding the suicide attempt. (R. 276-77.) A head CT scan was similarly unremarkable. (R. 280.) On November 28, 2001, Denise was admitted to the Tinley Park Mental Health Center following a court order that she obtain additional treatment and evaluation. (R. 300-02.) Approximately nine days later, on December 7, 2001, Dr.

B. Li discharged Denise from Tinley Park and referred her to the Will County Mental Health Center for further treatment. (R. 283-86.) In the Discharge/Transfer Summary, Dr. Li noted that Denise had been suffering from depression since her father shot himself in front of her in 1999, and that she had "resorted to the use of cocaine." Dr. Li diagnosed post traumatic stress disorder and low back pain. (R. 285-86.)

The parties do not dispute that for at least the next year and a half (through August 2003), Denise was afflicted with severe and chronic depression, as reflected in the following records: Physician's Notes from L.S. Boddapati, M.D., of the Will County Health Department, Division of Mental Health, from December 2001 to November 2002; a June 28, 2002, Psychiatric Review Technique Form completed by Kirk W. Boyenga, Ph.D.; a December 6, 2002, Psychiatric Report from Dr. Boddapati; March 2003 Physician Progress Notes from Sanjay Chatrath, D.O., of the Riverside Community Health Center in Wilmington, Illinois; and notes from Joel Carroll, D.O., from January to April 2003. (R. 330-68, 381-83, 384-97, 412-17, 421.) By June 26, 2003, Dr. Carroll reported that Denise was doing "relatively well," though she was still on probation and pregnant with W.D.D. (R. 411.) On August 25, 2003, Dr. Carroll found Denise to be "pleasant, interactive and cooperative," and indicated that "things are going very well." He noted that she was taking Zoloft, but stated that "[n]o other medications [were] ordered" at that time. (R. 410.)

## 2. Mental Health, January 2004 to January 8, 2005

There are no mental health treatment records between August 26, 2003 and January 26, 2004, when Denise started seeing Zaw Win, M.D., for her depression. She complained of anxiety, nervousness, nightmares and difficulty sleeping, but denied recent alcohol or drug use. Dr. Win observed that Denise was alert with reasonable hygiene and appropriate dress, though her speech was low and monotone. He instructed Denise to continue taking Zoloft and prescribed Remeron to help her sleep. Dr. Win noted that Dr. Carroll did not want to give Denise any benzodiazepine medication because Denise "tends to have drug seeking behaviors." (R. 487.)

4

Denise saw Dr. Win's Physician Assistant, Maryanne Schrage, on March 8, 2004. Ms. Schrage encouraged Denise to express her anger outward to prevent chest discomfort, and suggested that she take Buspar at bedtime to help with the anxiety. Denise was worried about W.D.D. because she was planning to undergo a 21-day treatment program for cocaine use and did not want him placed in foster care. Ms. Schrage suspected that Denise was "leaving a great deal out of the conversation today," noting that her statements regarding her court situation "d[id] not make sense." In that regard, Ms. Schrage found Denise to have very poor judgment and thought process. She also described Denise as "a little bit unstable in that she would frequently end up in tears." (R. 486.)

Denise appeared to be feeling better when she next saw Ms. Schrage on May 6, 2004. She exhibited appropriate affect, clear speech, and good thought process and judgment. She reported feeling a bit anxious at times, explaining that her sleep was "okay" but that she did not get enough of it. Denise told Ms. Schrage that she had been referred to the pain clinic for ongoing back pain, but indicated that she did not want to get steroid injections at that time. Ms. Schrage modified Denise's medications slightly, decreasing the Remeron and increasing the Buspar to twice a day. She agreed that Denise should continue taking the antidepressant Effexor as recently prescribed by her primary care physician. (R. 485.)

Ms. Schrage reported mixed findings on July 1, 2004, noting that Denise's dress, appearance, hygiene and affect were all appropriate; she had good cognition, memory, insight and thought process; but her judgment was not so good as evidenced by her failure to attend a required learning program designed to keep her out of jail, or to pursue bariatric surgery for her weight problem. Denise was not sleeping well and did not have a lot of self-confidence and only some self-esteem. (R. 484.) The following month, on August 5, 2004, Denise showed poor insight and judgment, flat affect and a depressed mood, with no self-confidence or self-esteem. She cried frequently throughout the visit and explained that she continued to face legal problems. (R. 483.)

5

Denise was doing better on September 13, 2004, though she was still stressed about the legal issues "hanging over her head." Ms. Schrage found Denise's self-confidence and self-esteem to be a bit weak, and noted that she was very upset about her "court situation" and problems involving one of her girlfriends. Ms. Schrage increased Denise's dose of Effexor to twice a day, and instructed her to continue taking Remeron, as well as Klonopin to help with anxiety. (R. 482.)

On October 8, 2004, Denise went to the Riverside Medical Center because "she was not looking so good." She appeared to have suffered a miscarriage and had taken an extra dose of the pain reliever Oxycontin. (R. 479.) Dr. Ayodele O. Ayoade observed Denise to be tearful and weak, and described her affect as being in the "constricted to depressed range." He could not conduct a full cognitive examination because Denise was poorly cooperative and weak, and he assessed her with "psychiatric problems that exacerbated most likely from drug use and losing her pregnancy." (R. 480-81.) Dr. Ayoade diagnosed major depressive disorder by history; panic disorder with agoraphobia; and cocaine abuse/dependence. He increased Denise's Effexor and gave her more Klonopin. (R. 481.)

Denise saw Ms. Schrage on October 18, 2004, and explained that she had missed her previous appointment due to the miscarriage. She started crying and "kept crying throughout the visit." Ms. Schrage found that Denise's attitude, insight and judgment were poor; she had a depressed mood and affect; and her self-confidence and self-esteem were very low. She gave Denise a two-week supply of Effexor and increased her Klonopin to three times a day. (R. 477-78.)

Over the next two months, Denise showed marked improvement. On November 1, 2004, Ms. Schrage described her as "very different today. . . . She was dressed very neatly and she had make-up and hair done. She looked very nice." Her attitude, insight, thought process and judgment were all good, and she reported going to Alcoholics Anonymous ("AA") meetings four times a week. She also reported that she was looking for a job. Ms. Schrage maintained Denise on her current doses of Klonopin, Effexor and Remeron at that time. (R. 476.) Two weeks later,

6

on November 15, 2004, Dr. Win found that Denise had good hygiene, a labile (adaptable) mood, and some self-confidence and self-esteem. She was a little worried about some impending court dates and her probation officer, but Dr. Win concluded that her medications should remain the same. (R. 475.)

Ms. Schrage gave Denise a similar report on November 29, 2004, but noted that her thought process, judgment, self-esteem and self-confidence could all be better. She told Denise to continue taking Effexor and Klonopin, but to stop taking Remeron "secondary to it not helping." (R. 474.) Denise last saw Ms. Schrage on December 30, 2004. She was doing well at that time, with good hygiene, attitude, insight, thought process and judgment. Her mood was euthymic (i.e., normal) and her self-confidence and self-esteem were very high. Ms. Schrage made no changes to Denise's medications and indicated that she "will follow up with me in one month." (R. 473.) A little more than a week later, however, on January 8, 2005, Denise died from an accidental drug overdose.

### 3. Physical Health

At all relevant times, Denise was considered obese, standing 5'4" and weighing above 250 pounds. She first started complaining of back pain on August 8, 2000, when she saw Dr. Sanjay Chatrath at the Riverside Community Health Center. She exhibited tenderness in the lower lumbar region but was in no acute distress. Dr. Chatrath diagnosed lower lumbar pain with possible intermittent right radiculopathy (i.e., pain, numbness, tingling, or weakness), and prescribed Celebrex. (R. 441.) Nearly four months later, on December 5, 2000, Denise reported to the Morris Hospital emergency room complaining of left wrist pain, headache and dizziness following a car accident. (R. 251-53.) X-rays showed no fracture of the wrist or pelvis, but revealed degenerative changes at L4-L5 and L5-S1, with "marked intervertebral disc space narrowing at L5-S1 likely representative of degenerative disc disease." (R. 256-57.) Dr. Mark Gibson diagnosed acute

7

cervical and lumbar strain, applied a splint to Denise's wrist, and discharged her with a prescription for Vicodin. (R. 252-53.)

When Denise went to Morris Hospital following her suicide attempt on November 19, 2001, she reported taking Vioxx for low back pain. (R. 265.) A November 20, 2001, Consultation Report indicated that she had degenerative spine disease and sciatica. (R. 269.) A November 28, 2001, Comprehensive Psychiatric Evaluation from Tinley Park similarly noted that Denise suffered from chronic low back pain and arthritis of the spine. (R. 301.) On July 25, 2002, Dr. Sarat Yalamanchili examined Denise for the Bureau of Disability Determination Services and diagnosed low back pain, "possibly related to her history of degenerative dis[c] disease." (R. 374-75.)

The next medical record significant for back pain is dated August 26, 2003, when Denise saw Dr. Chatrath for a cyst on her left breast, a mildly swollen left wrist, and back pain. Dr. Chatrath prescribed Naprosyn, Augmentin and Ultram. (R. 424, 462.) When Denise returned to Dr. Chatrath again on September 8, 2003, the cyst had healed but she was experiencing "[p]ersistent low-back pain" following an epidural injection. Denise said that she had been attending physical therapy, but that it was not really helping. Dr. Chatrath recommended that she get an MRI of her back, and gave her a trial course of Relafen and Ultram. (R. 425, 461.) Denise's October 3, 2003, MRI showed "[p]rotruding disc in the midline and mainly on the left at the L5-S1 level"; "[d]egenerative disc disease at the L4-L5 and especially the L5-S1 levels"; and "[m]ild to moderate spinal stenosis at the L5-S1 level." The radiologist noted a history of low back pain "radiating to bilateral legs but especially on the right." (R. 406, 426.)

Denise returned to Dr. Chatrath on October 14, 2003. At that time, he arranged for her to have an epidural injection through the pain clinic due to continued back pain. (R. 427, 460.) Denise was still waiting for the epidural on October 31, 2003, when she went to Dr. Chatrath in "moderate distress" complaining of persistent back pain. Denise was tender in the lower lumbar region on palpation, and Dr. Chatrath diagnosed severe back pain secondary to herniated disc and

8

degenerative disc disease. He gave Denise Vicodin, Zanaflex and Toradol for the pain, and instructed her to continue taking Naprosyn as well. (R. 429-30, 459.) Denise followed-up with Dr. Chatrath on November 18, 2003. She reported that she had missed her scheduled appointment with the pain clinic the previous day because she had to go to court. She said that she was still having "quite a bit of pain" and was taking three Vicodin and two Naprosyn tablets every day. Dr. Chatrath reiterated his diagnosis of herniated disc with persistent low back pain, advised Denise to schedule an appointment for the epidural, and referred her for physical therapy. He also gave Denise a Toradol injection for her moderate discomfort, and instructed her to continue taking Vicodin and Zanaflex. (R. 434, 454.)

On December 11, 2003, Denise told Dr. Chatrath that she had once again missed her appointment with the pain clinic, this time because she was in jail for two and a half weeks. Denise also had failed to start physical therapy. Dr. Chatrath found Denise to be in moderate distress, with tenderness in the lower lumber region and persistent lower back pain. He told her to continue taking Naprosyn, Zanaflex and Vicodin, and gave her the phone number for the pain clinic. (R. 436, 452.) Denise saw Dr. Chatrath again on January 5, 2004, due to congestion and a sore throat. She was still taking Naprosyn and Zanaflex, and had scheduled an appointment with the pain clinic. (R. 437, 451.)

Dr. Chatrath referred Denise to Donald E. Roland, M.D., for a consultation on January 12, 2004. Denise told Dr. Roland that she suffered from lower back pain radiating down into her left leg, and she described the pain as burning, aching, shooting, sharp and throbbing. (R. 525.) Denise reported trying a number of therapeutic procedures, including biofeedback, TENS unit,[1] acupuncture, chiropractic treatments, and physical therapy. She was taking Vicodin, Naprosyn,

---

[1]      "TENS," an acronym for Transcutaneous Electrical Nerve Stimulation, is "a pocket size, portable, battery-operated device that sends electrical impulses to certain parts of the body to block pain signals." (http://arthritis.about.com/od/assistivedevicesgadgets/g/tensunit.htm) (last visited Sept. 30, 2010).

and Zoloft at that time. She was also taking Novolin, or insulin, for diabetes. (*Id.*) Dr. Roland noted the October 3, 2003, MRI showing a protruding disc at L5-S1, degenerative disc disease at L4-L5 and L5-S1, and mild-to-moderate spinal stenosis at L5-S1.

On physical examination, Dr. Roland found Denise to have an unsteady gait and "difficulty toe walking and also heel walking," but observed that she "demonstrated very poor effort in doing these maneuvers." (R. 526.) Denise had limited range of motion in her back for extension and flexion, but a normal lumbar lordosis with no paraspinous muscle spasm. She exhibited decreased motor strength in the lower extremities on the right side for knee and hip extension and flexion, but "again, this was secondary to very poor effort on the patient's part." (*Id.*) Dr. Roland noted that Denise had decreased sensation to pinprick on the right side at L4-L5, and she tested positive for pain on flexion in internal rotation across both sides of her lower back. (R. 526-27.) Dr. Roland assessed lumbar sacral radiculopathy secondary to disc herniation at the L5-S1 level; low back pain secondary to degenerative disc disease at L4-L5 and L5-S1; and spinal stenosis with resultant low back pain and radicular pain into the right leg. He prescribed Vioxx and Ultram, and recommended that Denise return to his office in one week for a lumbar epidural injection. (R. 527.)

Two days later, on January 14, 2004, Denise attended physical therapy complaining of pain in her lower back and radiating down her right leg to her foot. She had an antalgic gait and "significant pain in the LB [lower back] area which limits her functional status." (R. 448.) The therapist recommended posture/range of motion exercises and strengthening one to three times per week for one month. On January 21, 2004, however, the pain clinic discharged Denise from physical therapy because she did not return following that single visit. (R. 439, 447-48.)

On March 15, 2004, Denise saw Gretchen Jones, P.A., at the Riverside Community Health Center for, among other things, lower back pain. Ms. Jones, who worked with Dr. Chatrath, diagnosed chronic back pain "secondary to some protruding dis[c]," and mild to moderate spinal stenosis per MRI. Denise told Ms. Jones that the epidural shots she received per Dr. Roland's

suggestion only lasted about three weeks before the pain returned. Ms. Jones advised Denise that her back pain may improve with weight loss, and they planned to discuss the matter at the next appointment. (R. 523.) On March 29, 2004, Ms. Jones refilled Denise's Zanaflex prescription and arranged to see her after Denise returned from a family wedding in Colorado. (R. 522.) A couple weeks later, in April 2004, Denise went to the emergency room complaining of back pain. She received Percocet but was still experiencing pain when she saw Ms. Jones on April 27, 2004. Denise indicated that she was depressed about having gained so much weight and expressed interest in bariatric surgery and weight loss medications. She also reported exercising "regularly." Ms. Jones refilled prescriptions for Percocet and Zanaflex and told Denise to increase her exercise. (R. 521.)

On June 9, 2004, Denise informed Ms. Jones that her pain clinic physician would not give her any more prescription refills because she "does not want to have needles stuck in her back anymore." Denise explained that the injections made her feel worse. Ms. Jones again prescribed Percocet and gave Denise samples of Effexor. She also told Denise to start an exercise program, working up to 30 minutes of walking at least five days per week. (R. 520.) On June 23, 2004, Denise was "doing well," although she wanted medication samples because she could not afford to pay for the drugs on her own. Ms. Jones adjusted Denise's medications and told her to return in two weeks. (R. 519.) At that visit on July 8, 2004, Denise reported exercising regularly but having little success losing weight on her own. She was taking a host of medications, including: Hydrochlorothiazide for high blood pressure; Acarbose, Lantus and Novolin for "diabetes, uncomplicated, Type II"; Crestor and Zetia for cholesterol; Percocet for pain; and Effexor for depression and anxiety. (R. 517.) Ms. Jones observed that Denise was in no acute distress but gave her Oxycontin to help ease the back pain. (R. 518.)

Denise saw Ms. Jones again on July 22, 2004. Ms. Jones ordered an MRI to see if Denise's back condition had changed and prescribed more Oxycontin and Oxycodone. (R. 516.)

The August 3, 2004, MRI showed moderate degenerative changes, but the radiologist found no definite herniated disc or spinal stenosis. (R. 512.) After reviewing the earlier MRI from October 3, 2003, however, the radiologist concluded that there was "bulging annulus asymmetrically to left at L5-S1"; left parasagittal herniated disc at that level with compression of the descending left S1 nerve root; midline focal bulge or herniated disc at L4-L5; and degenerative changes. The radiologist explained that the L5-S1 was "better visualized" in the earlier MRI, which apparently allowed for a more accurate comparison and diagnosis. (R. 513.)

At her next appointment on August 9, 2004, Denise reported that she had tripped at a grocery store and hurt her left ankle. Ms. Jones gave her Tylenol with Codeine. (R. 510-11.) On August 24, 2004, Denise reported that her sugars were "doing well," but that she was still experiencing ankle and back pain. By September 10, 2004, she needed refills of her pain medications, though she reported "trying to decrease her use of it." She told Ms. Jones that she was two months pregnant and smoking "10/day," but otherwise had no complaints. Ms. Jones gave Denise a new prescription for Oxycodone and instructed her to return in one month. (R. 507-09.) Denise reported to the health center on September 21, 2004, however, complaining of chest and abdominal pain. She reported being under a "huge amount of stress" and cried during the examination. Ms. Jones noted that Denise was depressed and anxious, and recommended that she go to the emergency room for evaluation. (R. 505-06.)

On October 4, 2004, Denise was still "acutely distressed" and reported having a recent miscarriage. She was experiencing back pain and abdominal cramping, and exhibited depressive symptoms. Ms. Jones gave Denise prescriptions for Oxycodone, plus Ativan for anxiety. (R. 503-04.) Ten days later, on October 14, 2004, Ms. Jones referred Denise for physical therapy due to pain in her right hip. (R. 502.) By November 4, 2004, Denise was "very active looking for employment," but was taking three, and sometimes more Oxycontin tablets per day to control her back pain. Ms. Jones instructed Denise not to take more than two pills a day and gave her a new

12

Oxycodone prescription. Denise was able to decrease her insulin use at that time, and she told Ms. Jones that she was attending AA meetings and making new friends. (R. 497-98.) On November 10, 2004, Denise called Ms. Jones asking for "anything" to help her "keep myself together" following her aunt's death. Ms. Jones advised her to take Ativan as needed, but not more than 6 mg/day. (R. 496.)

Denise continued to complain of low back and left hip pain on December 1, 2004. She had a normal gait, however, as well as full range of motion and normal stability, strength and tone. Ms. Jones gave Denise a solu-medrol injection to help with her difficulty walking and lower leg pain. (R. 493-94.) On January 4, 2005, Denise reported "moving a lot more and increasing her activity level which usually then increases her back pain." She was still taking Oxycodone, and Ms. Jones prescribed Ambien to help with insomnia. (R. 488-89.) Four days later, Denise died of an accidental drug overdose.

## B. The December 2003 Hearing

The record does not contain a transcript of the December 29, 2003, hearing, but ALJ Burton's decision summarizes the testimony. (R. 77-83.)

### 1. Denise's Testimony

Denise, whom the ALJ found to be "generally credible," stated that she lived with her mother, Ellen, and that on a typical day she took care of W.D.D., went grocery shopping and watched a movie. She also testified, however, that her mother took care of W.D.D. 70% of the time, washed the dishes, prepared meals and cleaned. (R. 80.) Denise told ALJ Burton that she was "unable to stand or sit for a prolonged amount of time and must lie down at times to relieve her pain." She had problems concentrating and remembering things, and misplaced objects. (Id.)

13

## 2. Medical Expert Testimony

Joseph Cools, Ph.D., testified as a medical expert ("ME") regarding Denise's impairments and physical limitations. Dr. Cools stated that, from April 1, 2001 until August 2003, Denise suffered from a major affective disorder, panic disorder, and a history of substance dependency and abuse. During that period, she exhibited moderate limitations in her activities of daily living, social functioning, concentration, persistence or pace, and she experienced one or two episodes of decompensation. (R. 79.) Dr. Cools did not believe that drug and alcohol abuse was material to this finding, noting that Denise still suffered from depression notwithstanding sustained abstinence. (Id.) As for Denise's functioning after August 2003, Dr. Cools opined that she had shown "significant improvements but would need to stay on prescription medication and obtain support for her substance abuse problem." (Id.)

## C. The December 2005 Hearing

### 1. Ellen's Testimony

At the second hearing on December 13, 2005, Ellen testified that Denise lived with her from 2001 until her death, and that she was W.D.D.'s guardian. (R. 608.) Ellen described Denise as having a lot of back pain, which made it difficult for her to walk or carry W.D.D. (R. 609.) After gaining weight and giving birth, Denise's back pain "got even worse." Ellen testified that Denise could not vacuum or do the dishes, and she lived with her mother in part so that Ellen could help care for W.D.D. (R. 610-12.) According to Ellen, Denise was very moody and spent a lot of time in bed laying on an ice pack or heating pad. (R. 612.) The Oxycodone did not "even really seem to kill the pain," which "just got progressively worse." (R. 613.) Denise was unable to handle stress and relied on her mother to take care of things. As Ellen explained, Denise "struggled with her mind all the time." (R. 616.)

14

## 2.    Medical Expert Testimony

Psychiatrist Robert W. Marquis, M.D., and internist Ashok G. Jilhewar, M.D., both testified as MEs at the second hearing. Dr. Marquis opined that up through August 2003, Denise's mental impairment met Listing 12.09 of the Social Security Regulations. (R. 595-97.) After that date, however, Dr. Marquis could not determine whether she continued to meet that Listing, or evaluate her work-related limitations. (R. 597.) Dr. Marquis explained that medical records throughout 2004 indicated that Denise was doing well, with good thought process and judgment, appropriate dress and hygiene, clear speech, and good self-confidence and self-esteem. (R. 598-99.) He acknowledged a setback in October 2004, but noted that Denise had suffered a miscarriage at that time. (R. 599.)

Dr. Jilhewar testified that Denise suffered from three severe impairments: morbid obesity, diabetes mellitus without complications, and chronic low back pain. (R. 600-01.) In Dr. Jilhewar's view, the objective medical findings did not support Denise's allegations of pain in certain respects. For example, on January 12, 2004, Denise complained to Dr. Roland of pain at a level of nine out of ten, but her lumbar lordosis was normal. Dr. Jilhewar testified that "[i]f the subjective symptom of nine over 10 is supported by physical findings, then the lumbar lordosis would be lost." (R. 602.) Dr. Jilhewar also was not impressed by Denise's poor effort during flexion and extension exercises. In addition, Dr. Jilhewar found a discrepancy between the August 3, 2004, MRI, which showed nerve compression on the left side, and Denise's weakness on the right side upon physical examination. (Id.) As for Denise's pain clinic visits, Dr. Jilhewar noted that she postponed treatment on some occasions "because of other more prioritized circumstances," such as being in prison or on a boat.[2] Dr. Jilhewar limited Denise to sedentary work, with a restriction to climbing no more than three or four stairs. (R. 603.)

---

[2]    The court is not certain what Dr. Jilhewar meant by "on a boat."

15

In response to questions from Denise's attorney, Dr. Jilhewar confirmed that Denise was prescribed Oxycontin, Oxycodone and Percocet, all of which are designed to address severe pain. (R. 604-05.) He agreed that "[p]ain is individual," and noted that he "is not equipped to deal with" individuals such as Denise who struggle with substance abuse. Dr. Jilhewar also opined that "[d]epression always makes the pain more serious," but that he did not account for Denise's psychiatric problems in assessing her work restrictions. (R. 605, 607.)

## D.    The November 2007 Hearing

### 1.    Ellen's Testimony

At the November 15, 2007 hearing, Ellen first confirmed the accuracy of her earlier testimony in December 2005 regarding Denise's back pain, difficulty caring for W.D.D., inability to do dishes or "anything, really," need to lay down a lot due to pain, frequent use of ice packs and heating pads, and mood swings. (R. 542-54.) Ellen stated that Denise's back pain got worse in her last year of life, and that the steroid shots did not really help for more than a couple months at a time. (R. 555.) She could not sit, stand or walk very long, and from a mental standpoint, she had good days and bad days. (R. 560.) Ellen testified that Denise could cook a little bit and do some laundry, but she always needed to lay down. When Denise went to visit her friend Mary, all she did was lay on the couch. Sometimes, however, she did go to movies or dinner with friends. (R. 568-69.) Ellen concluded by saying that Denise "couldn't do anything. . . . She was just there and I took care of her." (R. 570.)

### 2.    Vocational Expert Testimony

Timothy Bobrowski testified at the third hearing as a VE.[3] ALJ Martin described a hypothetical person of Denise's age, education and work experience, who could perform sedentary

---

[3]       Mr. Bobrowski also testified at the first hearing, but ALJ Burton did not discuss that testimony in any detail.

16

work, with no climbing of ladders, ropes or scaffolds; occasional climbing of ramps and up to three stairs; occasional balancing, stooping, kneeling, crouching and crawling; no exposure to unprotected heights or dangerous, moving machinery; and minimal contact with supervisors, co-workers and the public. In addition, the person would need to alternate between sitting and standing every 30 minutes to an hour, and could perform only unskilled, simple, routine, repetitive and low stress work. (R. 572-73.) Mr. Bobrowski testified that such an individual could not perform Denise's prior relevant work, but could work as a hand packer (2,000 jobs available); an assembler (3,000 jobs available); or an inspector (1,000 jobs available). (R. 573.) Mr. Bobrowski stated that such an employee would need to be on task 90% of the workday, but could do the work in either a standing or sitting position. The employee could not lay down during the day, however, or miss more than two days of work each month. (R. 574.)

## E.     The ALJ's Decision

In her January 22, 2008, decision, ALJ Martin found that Denise's morbid obesity, history of substance abuse, depression, anxiety, diabetes, and lower back pain were all severe impairments, and that from April 1, 2001, through August 31, 2003, Denise's depression met Listing 12.04(B). (R. 26.) After that date, however, her impairments no longer met or equaled any Listing, either alone or in combination. In reaching this conclusion, ALJ Martin acknowledged that Denise had prescriptions for Zoloft, Remeron and Buspar, but noted that her mental examinations were normal on May 6 and July 1, 2004. Denise's depressive symptoms returned in August 2004, and in October 2004 she was hospitalized "secondary to psychiatric problems thought to be resulting from drug use and miscarriage." (R. 27-28.) She tested positive for cocaine at that time and was tearful, weak, sad and depressed. By November 1, 2004, however, Denise showed improvement and was participating in therapy and drug rehabilitation. (R. 28.) ALJ Martin agreed with Dr. Cools' assessment that after August 2003, Denise's depression was "essentially controlled with a host of medications despite one exacerbation in October 2004 when she had relapsed into cocaine." (Id.)

17

ALJ Martin next determined that as of August 31, 2003, Denise had the RFC to perform sedentary work with a sit/stand option every 30 minutes to one hour; no climbing ladders, ropes, or scaffolds; occasional climbing of ramps and two to three stairs; occasional balancing, stooping, kneeling, crouching, and crawling; no exposure to heights or moving machinery; minimal interaction with the general public, supervisors and co-workers; and limitation to unskilled, routine, simple, repetitive tasks and low stress work. (R. 29.) ALJ Martin discussed Denise's history of back problems and agreed with Dr. Jilhewar that she could still perform sedentary work as set forth in the RFC. (R. 30-31.) She found Denise's statements concerning the intensity, persistence, and limiting effects of her symptoms to be "not entirely credible," noting that Denise was not compliant with physical therapy, and that examinations from July to November 2004 were all relatively normal. (R. 32.)

ALJ Martin similarly found Ellen to be "not entirely credible" based on inconsistencies in her testimony. At the November 2007 hearing, for example, Ellen said that Denise's psychiatric condition was better overall in 2004, yet at an earlier hearing she stated that the psychiatric problems would prevent Denise from working. ALJ Martin also believed that Ellen gave different explanations for why her daughter started using drugs: she saw her father commit suicide, and a police officer hurt her. (R. 33.) Those events, however, both occurred at the same time. (R. 285, 556-57.) In any event, ALJ Martin found that Ellen's description of Denise's severely decreased activity level was unsupported by either the physical findings, or by the fact that Denise visited her friend Mary on occasion. (Id.)

In accordance with her stated RFC, ALJ Martin accepted Mr. Bobrowski's testimony that Denise could not perform her past relevant work, but could work as a hand packer, assembler or inspector, jobs which all exist in significant number in the national economy. (R. 33-34.) Mr. Bobrowski confirmed that his testimony was consistent with the information contained in the Dictionary of Occupational Titles.

## DISCUSSION

### A. Standard of Review

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Social Security Act. See 42 U.S.C. § 405(g). In reviewing this decision, the court may not engage in its own analysis of whether Denise was severely impaired as defined by the Social Security Regulations. Young v. Barnhart, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." Id. (citation omitted). The court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." Id. (citing 42 U.S.C. § 405(g)). Evidence is considered substantial "so long as it is 'sufficient for a reasonable person to accept as adequate to support the decision.'" Ketelboeter v. Astrue, 550 F.3d 620, 624 (7th Cir. 2008) (quoting Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003)).

Although this court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." Scott v. Barnhart, 297 F.3d 589, 593 (7th Cir. 2002) (internal citations omitted). The court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." Young, 362 F.3d at 1002. Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." Hopgood ex rel. L.G. v. Astrue, 578 F.3d 696, 698 (7th Cir. 2009) (quoting Steele v. Barnhart, 290 F.3d 936, 940 (7th Cir. 2002)).

### B. Five-Step Inquiry

To recover DIB or SSI under Titles II and XVI of the Social Security Act, W.D.D. must establish that his mother was disabled within the meaning of the Act[4] from August 31, 2003 until

---

[4]     The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 et seq. The SSI regulations are virtually identical to the DIB regulations and are set forth at 20 C.F.R. § 416.901 et seq.

her death on January 8, 2005. 42 U.S.C. § 423(d); *Crawford v. Astrue*, 633 F. Supp. 2d 618, 630 (N.D. Ill. 2009); *Keener v. Astrue*, No. 06-CV-0928-MJR, 2008 WL 687132, at \*1 (S.D. Ill. Mar. 10, 2008). A person is disabled if she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.*; *Strocchia v. Astrue*, No. 08 C 2017, 2009 WL 2992549, at \*14 (N.D. Ill. Sept. 16, 2009). In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. §§ 404.1520; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

## C.  Analysis

The parties do not challenge the ALJ's decision to award benefits from April 1, 2001, through August 31, 2003, focusing instead on Denise's condition after that closed period. In support of his request for a reversal and remand, W.D.D. argues that: the ALJ erred in finding that Denise had the mental capacity to work after August 31, 2003; failed to evaluate properly Denise's back impairment; and made improper credibility determinations with respect to both Denise and Ellen. The court addresses each argument in turn.

### 1.  Medical Improvement

W.D.D. first objects to the ALJ's finding that Denise was capable of working as of August 31, 2003, due to medical improvement. Medical improvement is defined as "any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled." 20 C.F.R. § 404.1594(b)(1).

A finding of decreased medical severity must be based on "changes (improvement) in the symptoms, signs and/or laboratory findings associated with [the claimant's] impairment(s)." *Id.*; *Platt v. Astrue*, No. 4:08-cv-57-PPS, 2009 WL 4545149, at *6 (N.D. Ind. Nov. 30, 2009). When, as here, the ALJ finds the claimant disabled for a closed period in the same decision in which she finds medical improvement, the severity of the claimant's current medical condition is compared to the severity of the condition as of the disability onset date. *Koslow ex rel. Koslow v. Astrue*, No. 2:08-cv-159-PRC, 2009 WL 1457003, at *11 (N.D. Ind. May 22, 2009).

To determine whether medical improvement has occurred, the ALJ engages in an eight-step inquiry: (1) Is the claimant engaged in substantial gainful activity?; (2) If not, does the claimant have an impairment or combination of impairments which meets or equals the severity of a listed impairment?; (3) If not, has there been a medical improvement?; (4) Is the medical improvement related to the claimant's ability to do work?; (5) Do any exceptions to medical improvement apply? (6) Are the claimant's current impairments severe in combination?; (7) If so, can the claimant perform her past relevant work?; (8) If not, can the claimant do other work given her residual functional capacity, age, education and work experience? 20 C.F.R. § 404.1594(f); *Platt*, 2009 WL 4545149, at *5.

W.D.D. does not dispute that Denise no longer met a Listing after August 31, 2003, or that this constitutes medical improvement. (Doc. 56, at 9-10, citing 20 C.F.R. § 404.1594(c)(3)(i).) He insists, however, that Denise nonetheless remained incapable of working due to ongoing mental problems.[5] ALJ Martin discussed in detail Denise's history of depression and anxiety, including: her hospitalization in November 2001; continued depressive symptoms throughout 2002; anxiety over her legal problems; substance abuse; and multiple medications. (R. 26-27.) The ALJ cited evidence of fluctuations in Denise's mental state throughout 2004, such as: her normal mental

---

[5]     W.D.D. also claims that Denise was unable to work due to back pain. The court addresses that argument in the next section.

21

status examinations in May and July 2004; her poor insight and depressed mood in August 2004; her improvement in September 2004; and her "exacerbation" and hospitalization in October 2004 following a miscarriage. (R. 27-28.) By November 1, 2004, Denise was doing really well, attending AA meetings and looking for a job. She continued to receive positive evaluations throughout November and December 2004, leading the ALJ to conclude that after August 2003, Denise's depression was "essentially controlled with a host of medications despite one exacerbation in October 2004 when she had relapsed into cocaine." (R. 28.)

W.D.D. suggests that this conclusion is inconsistent with the ALJ's finding that Denise had marked restrictions in her activities of daily living, and marked difficulties in maintaining social functioning. (Doc. 56, at 10.) There is some confusion on this issue. In support of her determination that Denise had marked restriction in activities of daily living, the ALJ cited Denise's December 2003 testimony that her mother assisted her most of the time, and that she was unable to sit or stand because of difficulties with concentration and memory. (R. 28.) There is no indication, however, that Denise was describing only her abilities prior to August 31, 2003.

Regardless, the court agrees that from the context of the ALJ's opinion, it appears that the marked limitations refer only to the closed period from April 2001 through August 2003. As Defendant notes, in order to satisfy the "B" criteria of Listing 12.04, a claimant must have two of the following: (1) marked restriction in activities of daily living; (2) marked difficulties in social functioning; (3) marked deficiencies of concentration, persistence or pace; or (4) repeated episodes of decompensation, each of extended duration. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04B. To the extent ALJ Martin determined that Denise no longer met Listing 12.04 after August 2003, she could not also have found that Denise nonetheless had marked restrictions in two of the "B" criteria.

Moreover, medical records reflect that Denise exhibited periods of good thought process, judgment, cognition, memory and insight in May and July 2004, and that despite a setback

following a miscarriage in October 2004, she was doing very well again in November and December 2004. Dr. Marquis agreed that the majority of Denise's mental health records during that period stated that she was functioning well with no significant symptoms. With respect to the relapse in October 2004, Dr. Marquis found it understandable in light of Denise's recent miscarriage. (R. 597-600.) Contrary to W.D.D.'s assertion, there is nothing in the record to suggest that from a mental standpoint, Denise was markedly limited in her activities of daily living or social functioning on a continuing basis from August 31, 2003, until her death on January 8, 2005.

W.D.D. claims that the ALJ nonetheless erred in finding that Denise had the mental RFC to "understand, remember, and carry out unskilled, routine, simple, repetitive tasks with minimal interaction with the general public, supervisors, and co-workers and low stress work." (R. 29.) In W.D.D.'s view, "there simply is not evidence that Denise could actually do such work." (Doc. 56, at 10.) He notes that "[b]ecause response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job. A claimant's [mental] condition may make performance of an unskilled job as difficult as an objectively more demanding job." *Craft v. Astrue*, 539 F.3d 668, 677 (7th Cir. 2008) (quoting SSR 85-15).

"The assessment of a claimant's RFC is a legal determination reserved to the SSA." *Henning v. Astrue*, 578 F. Supp. 2d 996, 1014 (N.D. Ill. 2008). An ALJ must consider the entire record, "including all relevant medical and nonmedical evidence, such as the claimant's own testimony." *Id.* In this case, the record does not contain a formal mental RFC from a physician, and the only Psychiatric Review Technique Form dates to June 28, 2002, which was well within the closed period of disability. (R. 384, 394.) The ALJ thus turned to the medical evidence which, she said, reflected that Denise's depression was "essentially controlled with a host of medications." (R.

23

28.) This conclusion is supported by Dr. Marquis, who testified that "the majority of [the records] do say that [Denise] was functioning well . . . had no significant symptoms." (R. 598.)

W.D.D. disagrees, arguing that the treatment records themselves actually reflect ups and downs in Denise's mental state. (Doc. 74, at 5.) Things were going well for Denise in August 2003, but in January 2004 she had to start taking Remeron for sleep problems and anxiety. (R. 487.) In March 2004, Denise exhibited very poor judgment and thought process, and was "a little bit unstable in that she would frequently end up in tears." (R. 486.) Two months later, in May 2004, Denise showed good thought process and judgment, as well as clear speech and appropriate affect. (R. 485.) Three months later, in August 2004, however, Denise again presented with a depressed mood; poor insight and judgment; and flat affect. She also cried frequently throughout the visit. (R. 483.) Denise was better the following month, but suffered a relapse after miscarrying in October 2004. She improved greatly in November and December 2004, but died shortly thereafter.

The problem for W.D.D. is that, with the exception of the miscarriage episode, there is no evidence that Denise ever suffered from more than mild to moderate limitations after August 2003, or that she was incapable of engaging in substantial gainful activity ("SGA"). None of Denise's treating physicians suggested that her mental problems would preclude her from working. Moreover, the ALJ included restrictions in the mental RFC to accommodate Denise's demonstrated psychological limitations. For example, the ALJ accounted for any deficiencies in social functioning by limiting Denise to minimal contact with the general public, supervisors and co-workers. See *Rasnake v. Astrue*, No. 1:08-CV-134-PRC, 2009 WL 1085969, at *14 (N.D. Ind. Apr. 22, 2009) (noting that "the ALJ accounted for Plaintiff's deficiency in social functioning by incorporating interpersonal interaction limitations in his mental RFC.") As for Denise's activities of daily living, most of the testimony concerned back pain as opposed to mental problems. Ellen described Denise as very moody and unable to handle stress, and testified that she had good days and bad

24

days but "struggled with her mind all the time." The ALJ fairly addressed these issues by further limiting Denise to simple, routine, repetitive tasks and low stress, unskilled work.

W.D.D. objects that the ALJ did not properly account for Denise's difficulties with concentration and memory, which "would pose problems in any job, regardless of skill level." (Doc. 56, at 11.) Denise did testify in December 2003 to having problems remembering and concentrating. (R. 80.) The 2004 treatment records, however, do not reflect any ongoing problems in that regard. In the absence of any medical finding that Denise had limitations in concentration, persistence, or pace, the ALJ did not err in assigning a mental RFC for unskilled, simple, routine, repetitive tasks. Cf. Stewart v. Astrue, 561 F. 3d 679, 684-85 (7th Cir. 2009) (in posing hypothetical questions to a VE, ALJs cannot account for limitations of concentration, persistence and pace by restricting a claimant to simple, routine tasks).

W.D.D. finally contends that ALJ Martin improperly "used her own lay judgment to determine what Denise could do, as opposed to relying on specific medical evidence." (Doc. 56, at 11.) An ALJ "plays doctor" when she "fail[s] to address relevant medical evidence and substitute[s] for evidence [her] own assertions about the claimant's condition." Alexander v. Astrue, No. 09 C 3406, 2010 WL 3199356, at *11 (N.D. Ill. Aug. 10, 2010) (citing Dixon v. Massanari, 270 F.3d 1171, 1177 (7th Cir. 2001)). That is not what occurred here. W.D.D. does not identify any relevant medical evidence or treating or consulting opinion that the ALJ ignored in determining Denise's mental RFC. On the record presented, the ALJ's finding that Denise had the stated mental RFC for unskilled, low stress SGA after August 2003 is supported by substantial evidence.

### 2. Back Impairment

W.D.D. argues that the ALJ's decision remains flawed in that she "glosse[d] over the results of the two MRIs" in determining Denise's physical RFC. (Doc. 56, at 12.) Denise consistently complained of back pain as early as 2000, and was diagnosed with a history of degenerative disc disease. Denise's October 3, 2003, MRI showed: "[p]rotruding disc in the midline and mainly on

the left at the L5-S1 level"; "[d]egenerative disc disease at the L4-L5 and especially the L5-S1 levels"; and "[m]ild to moderate spinal stenosis at the L5-S1 level." The radiologist noted a history of low back pain "radiating to bilateral legs but especially on the right." (R. 406, 426.) A second MRI from August 2004 revealed: "bulging annulus asymmetrically to left at L5-S1"; left parasagittal herniated disc at that level with nerve root compression; midline focal bulge or herniated disc at L4-L5; and degenerative changes. (R. 513.) The ALJ did not mention either of these MRI exams.

Defendant suggests that the ALJ essentially acknowledged the MRI results by concurring with Dr. Jilhewar's expert opinion. (R. 31.) Specifically, Dr. Jilhewar noted an inconsistency between the August 2004 MRI, which showed nerve compression on the left side, and Denise's right-sided weakness upon examination. He also stated that his patients with similar MRI results "usually get better within four weeks." (R. 602.) Unfortunately, the ALJ did not discuss this aspect of Dr. Jilhewar's testimony, much less indicate that she somehow discounted the MRI evidence in reliance on that expert opinion. Instead, the ALJ focused on records which showed "normal" gait and "no neurological deficits," without mentioning the MRI results at all. (R. 32.) It is well-established that an ALJ "may not select and discuss only that evidence which favors h[er] ultimate conclusion." Gallo v. Astrue, No. 09 C 649, 2010 WL 2891679, at *13 (N.D. Ill. July 20, 2010). On the facts presented, the court cannot determine whether the ALJ properly considered the radiological findings in making her RFC determination. This is significant because the MRIs provide objective medical support for Denise's back problems and ongoing complaints of pain.

The ALJ made a similar error in discussing Denise's treatment history throughout the latter half of 2003 and 2004. During that time, Denise received Toradol injections and was prescribed Vicodin, Naprosyn, Ultram, Relafen, Zanaflex, Vioxx, Percocet, Oxycontin and Oxycodone. Dr. Jilhewar agreed that Percocet, Oxycodone and Oxycontin are designed to address severe pain, but the ALJ did not acknowledge this finding in her decision. Defendant cites Clark v. Sullivan, 891 F.2d 175 (7th Cir. 1989), for the proposition that pain is not disabling when controlled by

medication. *Id.* at 178. Perhaps, but the ALJ only made one reference to Denise's pain being under control with Oxycodone in November 2004. (R. 32.) This observation is incomplete, however, in that the ALJ failed to note that Denise was taking three or more pills per day at that time, when the prescribed dosage was only two per day. (R. 32, 497-98.)

The ALJ did note Dr. Jilhewar's remark that Denise failed to report to the pain clinic "due to being in prison and later for other reasons." (R. 31.) Even assuming that this somehow undermines a claim of disabling pain, neither Dr. Jilhewar nor the ALJ cited other evidence that the shots Denise received at the pain clinic made her feel worse, which could also explain her decision to honor court dates over pain clinic appointments. (R. 520.) Also troubling is the ALJ's failure to reference Dr. Jilhewar's assertion that he did not account for Denise's demonstrated psychiatric problems in assessing her work restrictions, even though he agreed that "[d]epression always makes the pain more serious." (R. 605, 607.) To the extent Denise's mental RFC reflected that she suffered from mild to moderate limitations, the ALJ was required to consider those impairments together with Denise's back problems, and evaluate their aggregate effect on her ability to work. Instead, the ALJ provided no evaluation of whether Denise's back pain was "exacerbated by [her] depression, or the reverse, and whether that might create a more severe limitation." *Gaylor v. Astrue*, 292 Fed. Appx. 506, 516 (7th Cir. 2008).

Defendant finds it significant that the ALJ formulated a physical RFC that was more restrictive than the one suggested by Dr. Jilhewar. Specifically, Dr. Jilhewar found Denise capable of sedentary work with limited stair climbing, while the ALJ added a sit/stand option every 30 minutes to one hour, no exposure to heights or moving machinery, and only occasional balancing, stooping, kneeling, crouching and crawling. (R. 29.) As explained, the ALJ did not build a logical bridge between the evidence and Dr. Jilhewar's stated RFC. This error is not rendered harmless merely because the ALJ included some additional restrictions, none of which is tied to a medical source. *See Keys v. Barnhart*, 347 F.3d 990, 994 (7th Cir. 2003) ("[T]he doctrine of harmless error

27

. . . is fully applicable to judicial review of administrative decisions." ); *Bacidore v. Barnhart*, No. 01 C 4874, 2002 WL 1906667, at *10 (N.D. Ill. Aug. 19, 2002) ("Harmless errors are those that do not affect an ALJ's determination that a claimant is not entitled to benefits.") The ALJ's physical RFC is not supported by substantial evidence, and the case must be remanded for further consideration of the objective radiological findings; any effects of depression on Denise's back pain; and the full scope of Dr. Jilhewar's testimony.

Before leaving this topic, the court briefly addresses W.D.D.'s argument that the ALJ failed to consider her obesity. On this point, the court disagrees. The ALJ expressly acknowledged Denise's obesity, and limited her to sedentary work with climbing restrictions to accommodate the effects of her weight. (R. 31.) There are no records suggesting that Denise's obesity caused any greater restrictions, and the ALJ's analysis satisfies the requirements of SSR 02-1p.

### 3. Credibility

W.D.D. finally seeks reversal and/or remand based on the ALJ's credibility determination. In assessing a claimant's credibility when the allegedly disabling symptoms (such as pain or fatigue) are not objectively verifiable, an ALJ must first determine whether those symptoms are supported by medical evidence. *See* SSR 96-7p, at 2; *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007). If not, SSR 96-7p requires the ALJ to "consider the entire case record and give specific reasons for the weight given to the individual's statements." *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009) (quoting SSR 96-7p). The ALJ should look to a number of factors to determine credibility, including "the objective medical evidence, the claimant's daily activities, allegations of pain, aggravating factors, types of treatment received and medication taken, and 'functional limitations.'" *Id.* (quoting 20 C.F.R. § 404.1529(c)(2)-(4)). Hearing officers are in the best position to evaluate a witness's credibility and their assessment will be reversed only if "patently wrong." *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir.

2000). A credibility determination is patently wrong only when it "lacks any explanation or support."
*Elder v. Astrue*, 529 F.3d 408, 13-14 (7th Cir. 2008).

W.D.D. first argues that the ALJ erred in finding Denise "not totally credible" because ALJ
Burton, the only hearing officer actually able to observe Denise as a witness, found her allegations
"generally credible." (R. 80.) As Defendant notes, these two credibility findings are not necessarily
inconsistent. In addition, the ALJ found that Denise "was non compliant with physical therapy,"
suggesting that her pain was not as bad as she stated. On the other hand, the ALJ did not discuss
the MRI evidence, which medically supported Denise's pain symptoms.

With respect to Ellen, the ALJ found that she made inconsistent statements during the
hearings, testifying in December 2005 that Denise started using drugs because her father
committed suicide, and stating in November 2007 that the drug use stemmed from a police officer
hurting her. (R. 33.) These events, however, both occurred at the same time and are not a proper
basis for rejecting Ellen's testimony. (R. 285, 556-57.) The ALJ next discounted Ellen's statements
regarding Denise's "severely decreased activity level (i.e., could not bend over sink, could not
vacuum, could not walk far, only up for an hour at a time during the day, and totally unable to take
care of her baby due to bad back)." (R. 33.) The ALJ stated that these statements were not
supported by the physical findings, presumably referring to her earlier conclusion that from July to
November 2004, "examinations were essentially normal." (R. 32.) As noted, however, the ALJ did
not mention the August 2004 MRI showing nerve compression, nor did she acknowledge that
Percocet, Oxycontin and Oxycodone are prescribed for severe pain. The mere fact that Denise
occasionally went to visit her friend Mary does not refute Ellen's claim that her daughter's back
problems were disabling. Ellen testified that Denise did nothing more than lay down at Mary's
house, just like she did at home.

On remand, the ALJ should take the opportunity to further evaluate the credibility of both
Denise's and Ellen's testimony in light of the record as a whole.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Judgment on the Pleadings [Doc. 55] is granted in part and denied in part, and Defendant's Motion for Summary Judgment is denied. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Administration for further proceedings consistent with this opinion.

ENTER:

Dated: October 1, 2010

SHEILA FINNEGAN
United States Magistrate Judge